[Civ. No. 559. Third Appellate District.—July 12, 1909.]

## A. DALTON HARRISON et al., Respondents, v. O. J. WOODWARD et al., Appellants.

ESCROW—ACTION TO RECOVER ESCROWED PAPERS—SETTLEMENT OF CORPORATIONS—ASSUMPTION OF DEBTS—FAILURE TO PAY AGREED SUM—TIME OF ESSENCE.—Where, upon the settlement of the affairs of a corporation, it was agreed that all of its stock, and other papers, should be deposited in escrow, and that plaintiffs should advance money to pay its debts on specific terms, and that a special advance of $40,000 should be repaid from assets or by defendants within six months, time being of the essence, and if not so paid, plaintiffs should be entitled to recover all of the escrowed papers, and there being default in such payment, plaintiffs were entitled to maintain an action to recover the same, making the defendants parties, so as to determine against them the breach of the conditions of the escrow.

ID.—APPLICATION OF PAYMENTS—DEDUCTION OF EXPENSES UNDER CONTRACT—EXCLUSIVE MODE OF APPLICATION.—The parties themselves having determined by the contract for the settlement of the corporation affairs that all expenses incurred in the course of liquidation by the plaintiffs shall first be deducted before any payments shall be applied upon the stipulated sum, the rule of application of payments established under the terms of the contract must be deemed exclusive.

ID.—SETTLEMENT OF CORPORATE AFFAIRS BETWEEN STOCKHOLDERS—RE-
LATION OF DEBTOR AND CREDITOR NOT INVALID—MISTAKEN APPLICA-
TION OF PAYMENT—ESTOPPEL.—In the settlement of the affairs of
a corporation between stockholders, the relation of debtor and cred-
itor does not exist between them, especially where defendants are
merely privileged and not bound to make payments, and the rule of
application of payments between debtor and creditor does not ap-
ply, and an improper credit of payment by plaintiffs does not estop
them from deducting expenses incurred pursuant to the contract
from such improper credit, before the application of payments under
the contract.

ID.—NATURE OF ACTION TO RECOVER ESCROWED PAPERS—FORFEITURE
NOT INVOLVED.—The action by plaintiffs to recover the escrowed
papers for nonpayment of the agreed sum within the time limited
is not in the nature of an action to enforce a forfeiture, but is au-
thorized by section 3280 of the Civil Code to recover specific personal
property not belonging to the escrowee, but held by him in trust,
and which the plaintiffs are entitled to enforce pursuant to the
terms and conditions of the escrow.

ID.—VALUE OF PROPERTY NOT INVOLVED—PLEADING.—The value of the
things held in escrow is not involved in the action, and plaintiff is
not required to allege their value, nor can the escrowee defend the
action on the ground that the things held by him are of no value
to the plaintiff. The action is not a claim and delivery; and the
plaintiff is only required to show that he is entitled, under the terms
and conditions of the escrow, to recover the specific and identical
things held by the escrowee.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco, and from an order deny-
ing a new trial. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Franklin P. Nutting, and Henry Brickley, for Appellants.

Wright & Wright, for Respondents.

BURNETT, J.—The determination of the controversy really
turns upon the construction of a certain agreement between
James E. Bell and A. Dalton Harrison, the parties of the
first part, and John M. Seropian and George M. Seropian, the
parties of the second part, executed on the twenty-third day
of January, 1904. These parties were the owners of all but

two shares of the capital stock of a corporation engaged in
the fruit business.  It is not disputed that the corporation
was indebted to various persons in a sum exceeding $135,000,
and it appears that it was insolvent.  The affairs of the con-
cern were involved in litigation, and there was great dissen-
sion and bitterness between Bell and Harrison on the one
hand and the Seropians on the other.  To prevent a sacrifice
of the property in a court of bankruptcy, and to effect a
permanent settlement of their joint affairs, the said agree-
ment was entered into by the terms of which the said Bell
and Harrison were to pay all the debts of the corporation,
provided the Seropians would contribute to its assets a fifteen
thousand dollar mortgage on their Fresno ranch, and the
former further covenanted to surrender to the latter all their
interest in said corporation upon repayment to them of the
sum of $110,000.  An escrow arrangement was devised to ac-
complish the desired result.  A satisfaction of said mortgage
and also all of the capital stock of the corporation owned
by the parties, properly indorsed so as to entitle it to be trans-
ferred on the books of the corporation, were deposited with
O. J. Woodward, subject to the following conditions, to wit:
''Said satisfaction of mortgage and all of said stock to be
delivered to second parties, they having performed all of the
terms and stipulations of this agreement by them to be per-
formed, whenever within two years from the date thereof
said first parties shall have been repaid, on account of their
advances made and those to be made to said corporation as
hereinbefore specified, the sum of one hundred and ten thou-
sand dollars U. S. gold coin. . . . It being a still further con-
dition of such payment that said $40,000 and interest thereon
be fully paid within six months from date hereof, . . . time
being expressly made of the essence of this agreement and
particularly of the escrow. . . . In the event, however, such
payments have not been made to said parties of the first part
in the amount and at the times hereinbefore specified, and
also in the event that parties of the second part have failed
or neglected to perform any of the covenants, terms, condi-
tions or stipulations on their part to be performed by this
agreement, then all of said capital stock so deposited in
escrow, and said satisfaction of mortgage shall be delivered

11 Cal. App.—2

to parties of the first part, and said escrow shall thereupon be terminated.''

The method contemplated for the repayment to the said parties of the first part is shown in the following provision of the agreement: ''It is further agreed that the parties of the first part shall have full charge of the liquidation of the affairs of said corporation of Seropian Bros. The parties of the first part shall proceed at once to sell in the name of said corporation, and shall sell as speedily as possible, at prevailing market prices, all fruits of said corporation; . . . it being understood that the cash proceeds of the liquidation of the assets of said corporation, including therein proceeds of sales of any assets of said corporation which shall be made during such liquidation, shall be applied on account of said sum of $110,000.''

It was further provided ''that all reasonable and proper expenses connected with the liquidation of the affairs of said corporation, including the packing, seeding and stemming required by agreements with the California Raisin Growers' Association, are to be taken from cash proceeds of liquidation before the application thereof to the payment of indebtedness of the corporation to the parties of the first part,'' and that the parties of the first part ''shall advance the sum of $3,500 to enable said corporation to complete its confirmation or purchase of raisins from the California Raisin Growers' Association, which said advance shall be considered one of the expenses of the liquidation of the affairs of the corporation, to be paid together with interest thereon from the date thereof, at the rate of six per cent per annum to said parties of the first part, independent of said sum of $110,000.''

On the ground that they had not been repaid the sum of $40,000 as prescribed, plaintiffs, after the expiration of the six months and the days of grace allowed, brought the action to recover a judgment directing the said O. J. Woodward to deliver to plaintiffs said documents held by him in escrow as aforesaid. Defendants denied ''that all money received by plaintiffs from the sale of the assets of said corporation or from any proceeds of said liquidation was credited by plaintiffs on the said sum of $40,000 and interest thereon that was to be paid to them in accordance with the terms of said agreement, but allege that large sums of money far exceeding

the said sum of $40,000 and said interest thereon were received by said plaintiffs and not credited on said sum of $40,000 or on their accounts with defendants.''

Defendants also filed a cross-complaint charging plaintiffs with inefficiency, want of diligence and criminal conspiracy in conjunction with their employees in their method of caring for the fruit and in selling the same and making collections therefor, whereby defendants were damaged in a sum exceeding $200,000.

The conclusion of the court was in favor of plaintiffs upon all the material issues. The amount including the interest to be paid within the six months was the sum of $41,200, and the court found that to this account no more than $31,000 could be credited as payment. This finding is the subject of the principal controversy between the parties.

Appellants insist that error was committed by the trial court in charging against this sum of $41,200, as expenses of liquidation, two items of $3,500 and $9,694.27. It seems that plaintiffs, about a week after the execution of said contract of January 23d, advanced the sum of $3,500 to ''complete the confirmation'' of the purchase of certain raisins pursuant to said contract, and on the same date they caused the corporation to execute and deliver a promissory note for $9,694.27 in favor of the First National Bank of Fresno. This note was also signed by the plaintiffs and was paid by them prior to the expiration of the term for the payment of the said sum of $41,200. Prior to the execution of the contract of January 23d the corporation, by George M. Seropian, acting president, entered into a contract for the purchase of a large quantity of raisins from the California Raisin Growers' Association, agreeing to pay therefor $19,614, paying on account ten per cent of the purchase price. Certain lots of these were sold and paid for prior to said January 23d, and at that time $13,194.27 was the balance due on the purchase price. As before stated, it was a part of the contract of liquidation that plaintiffs should advance the said sum of $3,500 to close the transaction of purchase, it being understood by the plaintiffs and the Seropians that Woodward would advance on the security of the raisins taken over the balance of the purchase price. The association was in need of funds and was insisting upon the payment by the corporation of its indebtedness.

The association owed the corporation $6,075 for rent of the latter's packing-house, and it had also agreed to pay the corporation a bonus of $3,375 on condition that the corporation keep its agreement as to the purchase of the raisins. Both these sums were likely to be lost if the purchase was not completed. Woodward refused to loan the $9,694 on the corporation's note to be secured by the raisins, but insisted upon the signatures, as joint makers, of Bell and Harrison. The note was thereupon executed upon the agreement of the association to waive all claim to the forfeiture of the said bonus of $3,375 and to pay at once the said rent of $6,075, then past due. This rent was applied to the payment of one of the obligations of the corporation which plaintiffs had assumed under the said contract of January 23d. As stated by respondents: "In purchasing these raisins the corporation not only saved the ten per cent which it had already paid, but made an immediate collection of $6,075, and a few months later of the bonus of $3,375, and in addition realized later the full value of the raisins purchased. Not to have completed this transaction would have been most detrimental to the interests of the corporation, and had Bell and Harrison failed to do so in the face of their stipulation to make the $3,500 advance, the Seropians would certainly, and properly so, have been most severe in their denunciation of them." Indeed, there can be no valid objection to the action of the plaintiffs in completing the purchase of the raisins. It was not only authorized by said contract of January 23d, but it was clearly within the principles of ordinary prudence and fair dealing. Nor does it seem a matter of just complaint that the payment was made a short time before plaintiffs could be compelled by Woodward to do so. They had a right to use their own judgment as to such details of the liquidation, and the trial court was justified in holding that they acted wisely and in the utmost good faith.

The appellants, however, contend that the respondents having rendered a statement to the Seropians under date of July 12, 1904, showing at that date $29,171.60 to have been paid on the said $40,000 and interest, leaving a balance of $10,870.49 to be paid on or before August 8th, the said respondents could not by a subsequent application of expenses of liquidation reduce this balance. Appellants declare:

"There can be no question as to when or how the changes in the application of payments took place. The first occurred on July 14, 1904, and consisted in taking the sum of $3,500 and interest from the $29,171.60 already credited on the $40,000 account, and with it paying the account entitled 'Catton, Bell & Co. % C. R. G. Assoc.' This amount was then charged to the debit side of the account with the Seropians. The next change was made on July 21, 1904, when the further sum of $8,241.77 was deducted from the $29,171.60 already credited on the $40,000 account to pay the remainder of the account entitled 'Bills Payable % C. R. G. A.' This change of application was noted in the statement sent to the Seropians on July 21, 1904. These two changes in the application of payments already credited on another account aggregated $11,747.77. Adding to $31,000—the amount found by the court to have been paid on the $40,000 account—the said sum of $11,747.77 and the amount paid by the Seropians was $42,741.77, $1,541.77 in excess of the amount required."

The point is that the law does not permit such a change of the application of payments already made on account. (*Wendt* v. *Ross*, 33 Cal. 650; *Cardinell* v. *O'Dowd*, 43 Cal. 586; *White* v. *Costigan*, 138 Cal. 564, [72 Pac. 178]; Civ. Code, sec. 1479, subd. 2.)

The trial judge, in disposing of this contention, used the following language: "There is some claim as to the way in which the various charges and credits are made in reference to settlements with the raisin association. I do not understand the claim to be made now that the plaintiffs are not entitled to credit the amount they paid in confirming that sale. . . . In determining how these credits and charges should be made, the defendants must consider the matter as simply between plaintiffs and the corporation without regard to the question whether the $40,000 was to be raised by a certain time. The charges should be made and the credits given just as they occurred. When the plaintiffs paid out money they paid it. Of course, that should be credited to them at that time. If they afterward got any money they would charge themselves with it, but only as of the time when they received it. The theory of the defendants seems to be that they should postpone any credits to themselves for payments because afterward they would be getting in more money.

That is not the proper theory of the case at all. They should be charged and credited just as the transaction occurred.''

The foregoing is the reasonable view, and is in accordance with the method contemplated by the parties. The stipulation to which we have already referred in relation to ''all reasonable and proper expenses'' of the liquidation cannot be construed as claimed by appellants.

The parties themselves by their contract having established a rule of appropriation, effect, of course, must be given to it to the exclusion of any other.

Again, the rule as to application of payments invoked by appellants is in force only between debtors and creditors. The parties here do not sustain that relation to each other. It is clear that no obligation was imposed upon the Seropians to make any payments whatever. They had the option to make sales and also from their own funds to supply any deficiency in the reimbursement of plaintiffs, but they were under no legal nor moral compulsion to do either.

Under some circumstances, after reporting $29,000 as paid on the $40,000 account, plaintiffs would be estopped from reducing it by reason of expenditures subsequently entered, but estoppel is not pleaded nor does it appear that appellants were misled to their prejudice.

It cannot be said that at any time within the six months was there in the hands of the liquidators the sum of $40,000 after deducting the just and reasonable expenses of liquidation, and therefore under the provisions of the escrow agreement plaintiffs were entitled to the documents held by Woodward. Indeed, the evidence shows that on August 16, 1906, five months prior to January 23, 1907, the date of the final payment under the contract, the liquidators had received only the sum of $32,871.03, with the packing-houses as the only remaining asset—which it is stated by respondents and not disputed by appellants was sold in the summer of 1907 for $14,000. Thus it is seen how barren ultimately would be the victory of appellants if they should be upheld in their technical view of the application of payments on the $40,000 account.

Appellants are equally at fault in their contention that this is a proceeding to which the rule applies that equity will not lend itself actively to enforce a penalty or forfeiture or a

loss in the nature of a forfeiture. The principle upon which appellants rely is stated in 1 Pomeroy's Equity Jurisprudence, section 459, as follows: ''When will a court of equity by its decree actively enforce or carry into effect a forfeiture? The general answer to this question is easy and clear. It is a well-settled and familiar doctrine that equity will not interfere on behalf of the party entitled thereto and enforce a forfeiture, but will leave him to his legal remedies, if any, even if the case be one in which no equitable relief would be given to the defaulting party against the forfeiture.'' But the forfeiture which equity hesitates to enforce is what Blackstone defines as ''a punishment annexed by law to some illegal act or negligence in the owner of lands, tenements or hereditaments, whereby he loses all his interest therein, and they become vested in the party injured as a recompense for the wrong which he alone or the public together with himself hath sustained.'' (2 Blackstone's Commentaries, 269.) It implies a breach of duty on the part of the one losing his interest in the property. In the case here no obligation was imposed upon defendants to make any payment. They had simply an option to do so, which they failed to exercise.

The action itself, while involving equitable principles, as it relates to the termination of a trust, has particular features that carry it beyond the ordinary range of equitable cognizance. Indeed, it is authorized by a special provision of the statute contained in section 3380 of the Civil Code that ''Any person having the possession or control of a particular article of personal property of which he is not the owner may be compelled specifically to deliver it to the person entitled to its immediate possession.'' There is no apparent reason why effect should not be given to this remedial measure, and since the evidence is clear that Woodward had in his possession these articles of personal property of which he was not the owner, and furthermore, that under the terms of the agreement of January 23d, plaintiffs had become entitled to the same, and it further appearing that there was nothing immoral, illegal or inequitable in the original transaction of January 23d, we have a proper case for the relief provided in said section 3380.

In fact, Woodward was the only necessary party defendant, and he obviously could not refuse to deliver the papers

to plaintiffs on the ground that the latter were seeking to enforce a forfeiture, as that is no concern of his. He is indifferent as between the other parties, and he claims no interest in the property beyond the right to hold the possession until the happening of a certain contingency. The Seropians were made defendants that judgment concluding the trust and directing the delivery of the said documents to plaintiffs might bind all and protect Woodward from further litigation of the question of fact as to whether said contingency had occurred.

It must be clear, therefore, that if we concede an element of forfeiture to be involved in the suit, it is not available as a defense to Woodward, it would not excuse him from delivering the papers to plaintiffs as he agreed, nor does it entitle the defendants to any affirmative relief, as that would be in violation of their contract with plaintiffs and opposed to the well-established principle that equity will not aid those who do not regard their covenants. The theory of appellants, therefore, leads to the conclusion that neither are they nor is Woodward entitled to the possession of the papers, but that he should deliver them to plaintiffs.

What has been said is perhaps a sufficient answer to appellants' contention that there should have been an allegation of the value of the property as is required in an action in claim and delivery. Technically, this is neither such an action nor is it a proceeding for specific performance, but it is an action for specific delivery of personal property under a title of the code providing for "Specific and Preventive Relief," and the measure of the relief granted is found in the provisions of chapter 1 of said title. Section 3380, as originally adopted, reads as follows: "Any person having the possession or control of a particular article of personal property of which he is not the owner may be compelled specifically to deliver it to the person entitled to its immediate possession in either of the following cases: (1) When the thing claimed is held subject to an express trust in favor of the claimant; (2) when pecuniary compensation would not afford adequate relief for the loss of the thing claimed; and (3) when it would be extremely difficult to ascertain the actual damage caused by the loss." It was amended by eliminating the specification of the cases in which it was allowed. The pur-

pose of the amendment undoubtedly was to enlarge its scope, although as it formerly stood it would have authorized this action, since the documents were held by Woodward "subject to an express trust." The tendency, however, of legislation as well as of its construction by the courts is to enlarge the operation of remedial principles to promote justice and prevent wrongdoing. The boundaries of equity are being constantly extended to meet the demands of our complex civilization. As said by Chief Justice Fuller in the case of *Union Pacific Ry. Co.* v. *Chicago etc. Ry. Co.*, 163 U. S. 564, [16 Sup. Ct. 1173] : "The jurisdiction of courts of equity to decree the specific performance of agreements is of very ancient date, and rests on the ground of the inadequacy and unfitness of the remedy at law. Its exercise prevents the intolerable travesty of justice involved in permitting parties to refuse performance of a contract at pleasure by electing to 'pay damages for the breach. It must not be forgotten that in the increasing complexities of modern business relations all equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies 'so that they shall correspond both to the primary right of the injured party and to the wrong by which that right has been violated,' and 'has always preserved the elements of flexibility and expansiveness so that new ones may be invented or old ones modified in order to meet the requirements of every case and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed.' (Pomeroy's Equity Jurisprudence, sec. 111.)''

There is nothing in the statute, nor can any good reason be advanced, requiring the plaintiff in an action of this kind to allege the value of the property. It would be a strange defense for Woodward to urge that he was not required to execute his trust because the property was of no pecuniary value to plaintiffs, and the only purpose to be subserved by an allegation of value would be to recover it instead of the property itself if possession of the latter could not be obtained. But plaintiff is not required to allege anything more than to show that he is entitled to recover what the statute specifically authorizes—that is, the possession of the identi-

cal thing detained. The position taken here by appellants is as destitute of merit as would be the contention that a plaintiff in an action of ejectment must allege the value of the real property in order to state a cause of action.

The judgment and order denying the motion for a new trial are affirmed.

Chipman, P. J., and Hart, J., concurred.